TRAVELERS CASUALTY AND
SURETY COMPANY, et al.,
Appellants–Defendants,

v.

UNITED STATES FILTER CORPORA-
TION n/k/a Water Applications & Sys-
tems Corporation, U.S. Filter Surface
Preparation Group Inc. n/k/a Interna-
tional Surface Preparation Group,
Inc., Wheelabrator Technologies, Inc.,
Waste Management Holdings, Inc.,
and Resco Holdings, L.L.C., Appel-
lees–Plaintiffs.

No. 49A02–0604–CV–289.

Court of Appeals of Indiana.

July 24, 2007.

·Richard A. Rocap, Rocap Witchger L.L.P, Indianapolis, IN, and Charles W. Browning (Pro Hac Vice), Stephen P. Brown (Pro Hac Vice), Michael D. Almassian (Pro Hac Vice), Mary Massaron Ross (Pro Hac Vice), Plunkett & Cooney, P.C., Bloomfield Hills, MI, for Travelers Casualty and Surety Company and The Travelers Indemnity Company.

Stephen J. Peters, Harrison & Moberly, LLP, Indianapolis, IN, for Federal Insurance Company.

David I. Rubin, Harrison & Moberly, LLP, Indianapolis, IN, for Zurich International (Bermuda), Ltd.

Scott A. Harkness, Bruce L. Kamplain, Norris Choplin & Schreoder, LLP, Indianapolis, IN, and Lizbeth J. Lemke, Cohn Baughman & Martin, Chicago, IL, for Westchester Fire Insurance Company, Century Indemnity Company, Industrial Underwriters Insurance Company, Republic Insurance Company, St. Paul Mercury Insurance Company, and U.S. Fire Insurance Company.

David A. Temple, Mathew J. Schafer, Drewry Simmons Vornehm, LLP, Indianapolis, IN, and Louis G. Corsi, Joseph Tomaino, Landman Corsi Ballaine & Ford, P.C., New York, NY, for TIG Insurance Company (as successor in interest on certain policies issue by International Insurance Company).

Donald B. Kite, Sr., Schultz & Pogue, LLP, Indianapolis, IN, and James P. Rug-

geri, Jeffrey D. Pariser, Catherine E. Stetson, Hogan & Hartson L.L.P., Washington, D.C., for Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company.

G. Ronald Heath, Hoover Hull LLP, Indianapolis, IN, and Jan M. Michaels, Scott M. Salerno, Stephen A. Skardon, Michaels & May, P.C., Chicago, IL, for Employers Mutual Casualty Company.

Donald G. Orzeske, Goodin Orzeske & Blackwell, P.C. Indianapolis, IN, and P. Russell Perdew, Lord Bissell & Brook, LLP, Chicago, IL, for Certain Solvent Insurance Companies of The Lloyds of London Market Companies.

Norman T. Funk, Rori L. Goldman, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, and Robert R. Anderson (Pro Hac Vice), Allison G. Margolies (Pro Hac Vice), Hughes Socol Piers Resnick & Dym, for Allstate Insurance Company, solely as a successor in interest to Northbrook Excess and Surplus Insurance Company.

George T. Patton, Jr., Adrian S. Allen, C. Joseph Russell, Bose McKinney & Evans, LLP, Indianapolis, IN, and Samuel B. Isaacson (Pro Hac Vice), Sonya D. Naar (Pro Hac Vice), DLA Piper U.S. LLP, Chicago, IL, for National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

Mary K. Reeder, Riley Bennett & Egloff, LLP, Indianapolis, IN, and David E. Schoenfeld (Pro Hac Vice), Irving C. Faber (Pro Hac Vice), Sarah D. McTurnan (Pro Hac Vice), Grippo & Elden LLC, Chicago, IL, for Continental Insurance Company, Continental Casualty Company, Columbia Casualty Company, and Transcontinental Insurance Company for themselves and Continental Insurance Company as successor in interest with respect to certain policies issued by Harbor Insurance Company and London Guarantee & Accident Company of New York.

Ryan H. Cassman, Coots Henke & Wheeler, Carmel, IN, for Allianz Insurance Company and Fireman's Insurance Company.

John T. Hume III, Adam A. Carroll, Hume Smith Geddes Green & Simmons, Indianapolis, IN, for Old Republic Insurance Company.

Michael B. Cracraft, Philip B. Mckiernan, Joseph M. Hendel, Hackman Hulett & Cracraft, LLP, Indianapolis, IN, and Laura A. Foggan, Katherine L. Van Pelt, of counsel, Wiley Rein & Fielding LLP, Washington, D.C., for Complex Insurance Claims Litigation Association.

Robert D. MacGill, Charles P. Edwards, T. Joseph Wendt, Barnes & Thornburg, LLP, Indianapolis, IN, and Robert D. Chesler (of counsel), Lowenstein Sandler PC, Roseland, NJ, for United States Filter Corporation, n/k/a Water Applications & Systems Corporation and U.S. Filter Surface Preparation Group, Inc., n/k/a Wheelabrator Group, Inc.

Fred R. Biesecker, Brent W. Huber, Brian E. Bailey, Ice Miller LLP, Indianapolis, IN, for Wheelabrator Technologies Inc., Waste Management Holdings, Inc. and Resco Holdings, LLC (Appellees/Cross–Appellants).

Kevin M. Toner, Baker & Daniels LLP, Indianapolis, IN, for Indiana Manufacturers Association and Duke Energy Indiana, Inc.

Charles M. Denton II, Eric C. Fleetham, Varnum Riddering Schmidt & Howlett, Grand Rapids, MI, for United Policyholders and Indiana Manufacturers Association.

Eric M. Cavanaugh, Duke Energy Shared Services, Plainfield, IN, and Wil-

liam G. Passannante (of counsel), Cort T. Malone (of counsel), Brittany Hillman (admission pending), Anderson Kill & Olick, P.C., New York, NY, and Amy Bach (of counsel), Law Office of Amy Bach, Mill Valley, CA, for Duke Energy Indiana, Inc.

George M. Plews, Christopher J. Braun, *Jeffrey D. Featherstun, Plews Shadley Racher & Braun*, Indianapolis, IN, for National Solid Wastes Management Association and Indiana Petroleum Marketers and Convenience Stores Association, Inc.

## OPINION

KIRSCH, Judge.

In this interlocutory appeal, Appellants–Defendants Travelers Casualty and Surety Company, Travelers Indemnity Company, and a number of other insurance companies[1] (collectively, "Insurers") appeal the Marion Superior Court's January 20, 2006 order granting partial summary judgment in favor of Appellees–Plaintiffs United States Filter Corporation n/k/a Water Applications & Systems Corporation and U.S.

Filter Surface Preparation Group Inc. n/k/a International Surface Preparation Group (together, "U.S.Filter"). Appellees–Plaintiffs/Cross–Appellants Wheelabrator Technologies Inc. ("WTI"), Waste Management Holdings, Inc. ("Waste"), and Resco Holdings, L.L.C. ("Resco") (collectively, "Waste Management"), also appeal the trial court's order, which denied their motion for partial summary judgment and granted summary judgment in favor of Insurers.

On appeal, Insurers raise the following issues:

I. Whether the trial court erred in concluding that U.S. Filter acquired the rights to and is entitled to seek insurance coverage under Insurers' policies when the relevant corporate transactions did not assign rights under those policies.

II. Whether the trial court erred in holding that U.S. Filter is not, as a matter of law, precluded from

1. In Appellant's case summary, which was filed with this court on April 4, 2006, the following entities were included as Insurers: Allstate Insurance Company (as successor in interest to Northbrook Insurance Company); Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company; Allianz Underwriters Insurance Company; American Centennial Insurance Company; American Home Assurance Company; American International Specialty Lines Insurance Company f/k/a American International Surplus Lines Insurance Company; American International Underwriters; American Motorists Insurance Company; Central National Insurance Company of Omaha; Centre Insurance Company (as successor in interest to London Guarantee & Accident Company of NY); Century Indemnity Company (as successor in interest to California Union Insurance Company and The Insurance Company of North America/INA); Columbia Casualty Company; Continental Insurance Company; Continental Casualty Company; Employers Mutual Casualty Company; Federal Insurance Company; Fidelity & Casualty Company of New York; Fireman's Fund Insurance Company; First State Insurance Company; Harbor Insurance Company; Hartford Accident and Indemnity Company; Highlands Insurance Company; Industrial Underwriters Insurance Company; Lexington Insurance Company; Certain Underwriters at Lloyd's of London and the Lloyd's of London Market Companies; National Union Fire Insurance Company of Pittsburgh, PA; Old Republic Insurance Company; Republic Insurance Company; St. Paul Mercury Insurance Company; TIG Insurance Company (as successor in interest on certain policies issued by International Insurance Company) Transcontinental Insurance Company; Travelers Indemnity Company; Twin City Fire Insurance Company; United States Fire Insurance Company; Westchester Fire Insurance Company (as successor in interest on certain policies issued by International Insurance Company) Zurich International Insurance Company; and ABC Insurance Companies 1–50.

seeking coverage under Insurers' policies notwithstanding U.S. Filter's noncompliance with the "consent-to-assignment" provision.

Appellee/Cross–Appellant Waste Management also raises the following issue:

III. Whether the trial court erred in granting U.S. Filter rights under Insurers' policies, but summarily denying Waste Management those same rights where no party requested such relief and no supportive evidence was designated.

We affirm in part, vacate in part, and remand.[2]

## FACTS AND PROCDURAL HISTORY

This dispute arises from U.S. Filter and Waste Management's (collectively, "Plaintiffs") efforts to assert rights under insurance policies that were issued to predecessor or affiliate companies. Plaintiffs seek coverage for thousands of underlying bodily injury claims allegedly caused by claimants' exposure to silica[3] while working in the vicinity of the Wheelabrator blast machine ("Wheelabrator blast"). Relying on a long line of corporate transactions, Plaintiffs assert that they have rights under policies issued by Insurers.

The significance of this litigation dates back to 1932 when the Plaintiffs' predecessors or affiliates first manufactured a product known as the Wheelabrator blast.

The Wheelabrator blast is an airless blast machine that was developed to mechanically clean pieces of metal. Using a "wheel with flanges that hurls 'shot' at the molded metal," the Wheelabrator blast removes sand, rust, scaling, or other material that has adhered to the metal. *Appellants' Joint App. ("Joint App.")* at 273. Although initially used by foundries, the Wheelabrator blast's uses expanded to markets such as automotive, aviation, machine tool, appliances, plastics, steel processing, rubber, and railroad. Silica and mixed dusts are byproducts of the Wheelabrator blast process, and long-term exposure to these substances has been linked to the development of the disease Silicosis.[4]

U.S. Filter commenced this action for declaratory judgment and breach of contract by way of complaint, filed June 18, 2004, seeking "defense and indemnification of numerous underlying product liability lawsuits under various liability insurance policies issued by [Insurers] . . . and purchased by predecessors in interest to U.S. Filter/Wheelabrator. . . ." *Id.* at 221–22. Waste Management successfully moved to intervene arguing that it too was the proper entity to assert rights under the policies. On January 13, 2005, the Plaintiffs jointly filed a First Amended Complaint For Declaratory Relief and Damages. *Id.* at 248. Insurers answered denying any obligation to provide coverage to Plaintiffs

---

**2.** We held oral argument on this case on December 12, 2006 in Indianapolis. We commend counsel and amici curiae on the quality of their advocacy.

**3.** Silica, or silicon dioxide, is a naturally occurring mineral that is composed of one silicon atom and two oxygen atoms. When silica molecules line up and create a repeating pattern they form a crystal (crystalline silica). Different crystal patterns are given different names, such as quartz, cristobalite, and tridymite, to name a few. http://www.

silicosisfyi.com. The Wheelabrator blast produced a dust that contained silica.

**4.** Silicosis, an occupational lung disease, is a respiratory disease caused by inhalation of silica dust. http://www.silicosisfyi.com. When crystalline silica (a component of silica dust) is inhaled, it causes inflammation of the lung tissue. *Id.* This inflammation leads to scar tissue formation on the lungs, also known as nodules, which obstructs the flow of oxygen into the lungs and into the bloodstream. *Id.*

under the policies. With the consent of the trial court, on September 2, 2005, the Plaintiffs filed a Second Amended Complaint for Declaratory Relief and Damages, and stated the nature of the case as follows:

> [Insurers] issued various occurrence-based liability policies for the periods 1954 and after, pursuant to which they owe Plaintiffs insurance coverage, insurance proceeds or other benefits (such as a defense) in relation to numerous lawsuits against Plaintiffs alleging personal injury from exposure to silica and mixed dusts, purportedly caused by certain products manufactured by alleged predecessors or affiliates of Plaintiffs ("Insurance Policies"). A listing of the Insurance Policies is attached as Exhibit A. Insurance Policies shall also include any additional liability policies issued by [Insurers] that have not yet been identified by Plaintiffs as providing coverage for the entities that manufactured and/or sold the Wheelabrator (as defined below) prior to 1997.

*Id.* at 271. In their answers, Insurers admitted to having issued policies to certain corporate predecessors of Plaintiffs, but denied that Plaintiffs were entitled to insurance coverage under the policies. *Id.* at 295.

The trial court bifurcated the proceedings. Phase I was limited to discovery and motions relating to the effect that the complicated corporate history had on the Plaintiffs' assertion that each had rights under insurance policies that had been issued to other corporate entities and not to them. If the trial court determined that the Plaintiffs were entitled to seek coverage under the policies, then Phase II would resolve the remaining coverage issues for the silica claims. After extensive discovery, Insurers sought summary judgment as to Phase I issues.[5] *Id.* at 321. The Plaintiffs also moved separately for summary judgment as to Phase I, each in its individual favor. *Id.* at 1673, 1876.

Following oral argument, the trial court issued the following order:[6]

> 4. In that the Waste Management Plaintiffs have transferred all insurance rights and liabilities associated with the now infamous [Wheelabrator blast] machine at issue to Plaintiff United States Filter Corporation, the Court now GRANTS Summary Judgment to the Defendants finding that the Waste Management Plaintiffs no longer have a right to seek coverage or proceeds under the Insurance Policies which are the subject of this litigation. Accordingly, the Court also DENIES the Waste Management Plaintiffs' Motion for Summary Judgment. There are no genuine issues of material fact on these issues and the Defendants

---

5. Between 1986 and 1996, National Union and Continental (together, "NU & C") issued policies (the "post–1986 policies") directly to WTI, Waste, and WTI's predecessor, The Henley Group, Inc. In their brief, NU & C clarified that, while all Insurers had moved for summary judgment on the Phase I issues, NU & C's motion was directed against U.S. Filter Plaintiffs and not against WTI, Waste, or Resco (collectively, "Waste Plaintiffs") since Waste Plaintiffs were named insureds on the post–1986 policies. *Appellants* NU & C's Br. at 1–2.

6. In the order, the trial court also: (1) granted Fidelity and Casualty Company of New York and Transcontinental Insurance Company's motion to dismiss; (2) granted U.S. Filter's motion to dismiss without prejudice claims brought regarding certain policies; and (3) granted a motion to strike U.S. Filter's tendered proposed findings, conclusions of law, and entry of judgment.

are entitled to Judgment as a matter of law.

5. The Court now GRANTS Summary Judgment to Plaintiff United States Filter Corporation as follows:

a. United States Filter Corporation has a right to seek insurance coverage or proceeds under the insurance policies still pending in this case.

b. The clauses in the Insurance Policies pertaining to assignments do not apply as a matter of law or fact to the rights of Plaintiff United States Filter Corporation.

Accordingly, the Defendant[s'] Motions for Summary Judgment aimed at Plaintiff United States Filter Corporation are DENIED. There are no genuine issues of material fact on these issues and Plaintiff United States Filter Corporation is entitled to Judgment as a matter of law.

*Id.* at 57–58.

Insurers moved for certification of the trial court's January 2006 order and for a stay of proceedings pending appellate review. The trial court granted the motion, certified its interlocutory order for immediate appeal, and stayed further proceedings pending appellate review. This court accepted jurisdiction over this interlocutory appeal and thereafter held a pre-appeal conference. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

Insurers first contend that the trial court erred in granting summary judgment in favor of U.S. Filter. Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Walton v. First American Title Ins. Co.*, 844 N.E.2d 143, 146 (Ind.Ct.App.2006), *trans. denied; American Family Mut. Ins. Co. v. Hall,* 764 N.E.2d 780, 783 (Ind.Ct.App.2002), *trans. denied.* Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Walton,* 844 N.E.2d at 146; *Hall,* 764 N.E.2d at 783. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Walton,* 844 N.E.2d at 146. Our standard of review is not altered by cross-motions for summary judgment. *Indiana Ins. Co. v. American Cmty. Servs., Inc.,* 718 N.E.2d 1147, 1152 (Ind.Ct.App.1999).

■ On appeal, the trial court's order granting a motion for summary judgment is cloaked with a presumption of validity. *American Home Assur. Co. v. Allen,* 814 N.E.2d 662, 666 (Ind.Ct.App.2004), *trans. dismissed* (2005). A party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we must affirm. *Matteson v. Citizens Ins. Co. of America,* 844 N.E.2d 188, 192 (Ind.Ct.App. 2006).

## I. The Corporate Transactions

Insurers contend that the trial court erred in granting summary judgment in favor of U.S. Filter. Specifically, Insurers contend that the relevant corporate transactions, which led to U.S. Filter's ownership of the Wheelabrator blast business, did not also grant U.S. Filter the right to seek insurance coverage or proceeds under

the insurance policies still pending in this case. Insurers argue that, without this right, reversal of summary judgment is warranted.

To analyze the issue, it is necessary to understand the details concerning the occurrence-based liability policies for the periods 1954 and after, and the business transactions that led to U.S. Filter owning the Wheelabrator blast assets in 1996. On June 1, 1954, Bell Aircraft Corporation ("Bell Aircraft") acquired the stock of American Wheelabrator & Equipment Corporation ("AW & EC"), the entity that manufactured the Wheelabrator blast. *Joint App.* at 1689. As the owner of AW & EC, Bell Aircraft also owned AW & EC's assets, rights, and liabilities. In 1955, AW & EC changed its name to Wheelabrator Corporation ("Wheelabrator I"). From 1955 through 1960, Wheelabrator I manufactured the Wheelabrator blast in Mishawaka, Indiana. During that same time, Bell Aircraft, the Wheelabrator blast's owner, was insured under insurance policies issued by Travelers' predecessor, Aetna Casualty & Surety Company. *Id.* at 1691.

In July 1960, Wheelabrator I merged with Bell Aircraft to form Bell Intercontinental Corporation ("Bell Intercontinental"), which was "majority-owned by Equity Corporation." *Id.* at 1689. Following this merger Bell Intercontinental owned all of Wheelabrator I's assets and liabilities (and thus also those of AW & EC). Because this was a merger, the insurance policies covering the manufacturing of the Wheelabrator blast also transferred to Bell Intercontinental by operation of law. *See* IC 23–1–40–6 (when a merger takes effect, the title to all real estate and other property owned by each corporation party to the merger is vested in the surviving corpora-

tion without reversion or impairment). A subsequent merger between a subsidiary of Bell Intercontinental and the Wheelabrator division of Bell Intercontinental resulted in the incorporation of "Wheelabrator II"—an entity that again owned all of Wheelabrator I's assets, liabilities, and insurance policies

From 1960 through 1971, Bell Intercontinental, Wheelabrator blast's owner, continued to be insured by Travelers' predecessor. In 1971 Bell Intercontinental, Frye Industries, and Wheelabrator II merged into Equity Corporation, which, as part of the merger, changed its name to Wheelabrator–Frye, Inc. ("Wheelabrator–Frye"). Through that merger, the policies issued in 1954 and thereafter, which insured the Wheelabrator blast were again transferred to Wheelabrator–Frye.

From 1971 through 1983, Wheelabrator–Frye maintained a commercial liability insurance program of occurrence-based policies that insured the company as a whole. During 1983 and 1984, the ownership of Wheelabrator–Frye changed [7] but WheelabratorFrye continued to exist, continued to manufacture the Wheelabrator blast in Mishawaka, Indiana, and continued to own all insurance rights ever associated with the Wheelabrator blast.

In March 1985, Wheelabrator–Frye dissolved into Signal Applied Technologies ("SAT"), another subsidiary of Signal. One week later, SAT performed an internal reorganization and, by means of a letter dated March 29, 1985, transferred all of the assets and liabilities associated with its Material Cleaning Services Division, which manufactured the Wheelabrator blast, to SAT's new wholly-owned subsidiary, The Wheelabrator Corporation

---

**7.** In 1983, Wheelabrator–Frye was the surviving corporation when it merged with Signal

Sub, Inc. (a subsidiary of Signal Companies ("Signal")).

("Wheelabrator III"). The letter in pertinent part provided:

> Signal Applied Technologies Inc. (the "Corporation") hereby assigns and transfers to you, as a contribution to your capital, all of the assets, subject to its liabilities, wherever located, of the Materials Cleaning Systems Division of the Corporation, such contributions to be effective as of the date hereof.

*Joint App.* at 1400.

Wheelabrator III continued to manufacture the Wheelabrator blast at the same facility, with the same supervisory and operational employees, and following the same procedures and protocols that had been used for years by its predecessor, Wheelabrator–Frye. At the operational and functional level, Wheelabrator III did not change any material elements of how Wheelabrator–Frye manufactured the Wheelabrator blast.

On September 19, 1985, Signal, the parent company of Wheelabrator III, merged with Allied Corporation to form a new company called Allied–Signal Inc. On February 26, 1986, Allied–Signal spun off various former Signal assets to The Henley Group, Inc. ("Henley"), including the Wheelabrator blast business. This spin-off was governed by the February 26, 1986 Reorganization and Distribution Agreement ("Distribution Agreement") between Allied–Signal and its subsidiary Henley and the May 21, 1986 General Assignment of Assets and Assumption of Liabilities ("General Assignment") between Allied–Signal's subsidiary (Allied Corporation) and Henley's subsidiary (Newco (Allied)). The General Assignment, which assigned the assets and liabilities, was deemed to be an implementing step of the spin-off. *Id.*

at 1634. Following the spin-off, and as a result of various name changes, Henley became the Wheelabrator Group in 1988 and, in turn, became Wheelabrator Technologies in 1989.

On September 7, 1990, Waste acquired majority ownership in Wheelabrator Technologies, thereby acquiring the assets and liabilities of the Wheelabrator blast business. Finally, under a Purchase and Sale Agreement dated September 14, 1996, U.S. Filter acquired the assets and liabilities of the Wheelabrator blast business as part of a much larger transaction with Waste.

As noted above, from 1954 through 1996, the Wheelabrator blast business was insured under insurance policies procured by the then-owners of the Wheelabrator blast business or their parent companies.[8] All of the policies contained a consent-to-assignment clause. The text of the consent-to-assignment language was generally in one of the following two forms:

1. Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon.

2. TRANSFER OF YOUR RIGHT AND DUTIES UNDER THIS POLICY—Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

*Joint App.* at 1776–79.

The policies further provided "occurrence-based" coverage, i.e., coverage under which the Insurers agreed to provide indemnity and defense against bodily injury suits whenever brought, so long as they were based on injuries that took place during the policy period. *Id.* at 1892.

---

**8.** Insurance policies for the following six entities were involved: Bell Intercontinental Corp./The Equity Group; Wheelabrator–Frye Inc.; The Signal Cos., Inc.; The Henley Group, Inc.; Wheelabrator Technologies Inc.; and Waste Management Inc./WMX Technologies, Inc. *Appellee Waste Management's Br.* at 6.

None of the policies material to this litigation was issued to U.S. Filter or identified U.S. Filter as a named insured. Further, no consent was obtained to transfer insurance policies as part of the asset transfers in the 1986 or 1996 transactions.

Insurers assert that U.S. Filter could not have obtained insurance coverage because the transfer of the insurance policies required consent to assign and, under the terms of the Distribution Agreement and General Assignment, Allied–Signal specifically reserved ownership of all contracts that required consent to assign. *Id.* at 1410. As support for this contention, Insurers cite to the following language in the Distribution Agreement and its attached Schedule 6.02:

> Section 6.02 Consents and Approvals. The parties shall use reasonable efforts to obtain the consents and approvals, to enter into the amendatory agreements and to make the filings and applications contemplated by Schedule 6.02.

*Id.* at 1459.

> Schedule 6.02
>
> A. Consents and Approvals
>
> . . .
>
> 2. Consents to the assignment to Henley or its subsidiaries of those agreements (including without limitation leases and licenses) *entered into in the ordinary course of business* of the Former Allied Businesses and the Former Signal Businesses, which consents are required by the terms of any such agreement.

*Id.* at 1590 (emphasis added). Arguing that the pre–1986 insurance policies were entered into in the ordinary course of business, Insurers contend that this language makes consent a precondition to the transfer of the policies.

Insurers also note that the following language in the General Assignment—the implementing step in the distribution of assets from Allied–Signal's subsidiary, Allied Corporation, and Henley's subsidiary, Newco (Allied), Inc.—requires Insurers' consent before the insurance policies may be transferred:

> To the extent that the assignment of any contract agreement, license or authorization to be assigned to Assignee pursuant to the Distribution Agreement shall require the consent of any other party, or shall be subject to any option in any third person by reason of any transfer to Assignor, this instrument shall not constitute a contract to assign the same if an attempted assignment would constitute a breach thereof or would create rights in third parties against the Assignor. The Assignor and Assignee shall use reasonable efforts to obtain consent to any such assignment.

*Id.* at 1611–12. Because all parties admit that no consents were sought or obtained during the 1986 transaction, Insurers conclude that the pre–1986 policies could not have been transferred to Henley or its subsidiary, Newco (Allied), Inc.

Insurers apply the same reasoning to the 1996 transaction, by which assets were transferred to U.S. Filter, again, without obtaining consent for the transfer of insurance policies. Noting that Waste could not take more than Henley had and U.S. Filter could not take more than Waste had, Insurers conclude that U.S. Filter could not have obtained possession and ownership of any insurance policies issued prior to 1996.

We agree with Insurers that without their consent, the pre–1986 insurance policies could not have been transferred from Allied–Signal to Henley during the 1986 transaction and, therefore, were not part of the 1996 transfer between Waste Management and U.S. Filter. Contrary to Insurers' contentions, however, the fact that

the policies were not transferred to U.S. Filter does not end our inquiry as to whether U.S. Filter can make claims under the policies at issue.

■ Instead, we must decide whether the right to coverage arises from a prior injury that occurred during an Insurers' policy period. Such a right would constitute a chose in action, "which is a 'proprietary right in personam, such as a debt owed by another person . . . or a claim for damages in tort . . . [or a] right to bring an action to recover a debt, money, or thing.'" *Midtown Chiropractic v. Illinois Farmers Ins. Co.*, 847 N.E.2d 942, 944 (Ind.2006) (quoting *Black's Law Dictionary* 258 (8th ed.2004)). Our Supreme Court discussed the law controlling the assignment of a chose in action in *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 339–40 (Ind.1991), where it observed that hardly any chose in action was assignable under old common law because of concerns about champerty and maintenance.[9] However, the assignment of such interests has gained gradual acceptance over time, beginning with those interests based in contract, and later for torts against personal property. *Midtown Chiropractic*, 847 N.E.2d at 945. "Today, the non-assignability of a chose in action has become so restricted that it is now the exception to the rule of free assignment." *Picadilly*, 582 N.E.2d at 340 (citing *Essex v. Ryan*, 446 N.E.2d 368, 374 (Ind.Ct.App.1983)). Thus, a contract-based chose in action is considered assignable unless it is purely

personal in nature, and one based in tort is assignable if it arises out of injuries to personal property. *Id.*

■ This court has never addressed the question of when a chose in action becomes an enforceable right. The Insurers contend that the analysis of the California Supreme Court in *Henkel Corp. v. Hartford Accident & Indemnity Co.*, 29 Cal.4th 934, 129 Cal. Reptr.2d 828, 62 P.3d 69 (2003) should apply. In *Henkel*, the California Supreme Court, applying precedent under circumstances similar to those presented here, determined that no chose in action existed at the time of transfer and no cause of action for breach of duty could be assigned because the claims "had not been reduced to a sum of money due or to become due under the policy" and because the insurers "had not breached any duty to defend or indemnify" the named insured. *Henkel*, 129 Cal.Rptr.2d 828, 62 P.3d at 75.

Indiana has long recognized that an insurance policy is a contract. As with other contracts, we interpret an insurance policy with the goal of ascertaining and enforcing the parties' intent as manifested in the insurance contract. *Property–Owners Ins. Co. v. Ted's Tavern, Inc.*, 853 N.E.2d 973, 977 (Ind.Ct.App.2006). Here, the insurance policies were occurrence-based and, thus, obligated the Insurers to provide indemnity and defense against bodily injury suits whenever brought, so long as they were based on occurrences that took place during the policy period.[10] *Joint App.* at 1892.

---

**9.** As our Supreme Court noted in *Midtown Chiropractic*,

> Champerty and maintenance refer to arrangements where a party acquires an interest in something merely by participating in a lawsuit in which the party otherwise has no independent status to join. *Reichhart v. City of New Haven*, 674 N.E.2d 27, 32 n. 3 (Ind.Ct.App.1996). A person, otherwise a stranger to the parties and litigation, giving aid to a litigant and receiving a stake

> in the dispute constitutes champerty. *Id.* Where the stranger intermeddles in the litigation by promoting, encouraging, or assisting it but does not receive any part of the subject matter of the litigation in return, maintenance is said to have occurred. *Id.* 847 N.E.2d at 944.

**10.** In some of the earlier policies issued by Travelers' predecessor, the policies explained "occurrence basis" as:

■ We recognize that under the reasoning of *Henkel,* a chose in action arises when the claim has been reduced to a sum of money. However, we are persuaded by the United States Supreme Court's reasoning in *Century Tablet Manufacturing Company:*

> With a fire loss, the obligation to pay arises upon the fire. Unlike an executory contract to sell, the casualty cannot be rescinded. Details, including even the basic question of liability, may be contested, but the fundamental contractual obligation that precipitates the transformation from a chose in action consisting of a claim for insurance proceeds is fixed by the fire. (Footnote omitted).

*Cent. Tablet Mfg. Co. v. United States,* 417 U.S. 673, 685, 94 S.Ct. 2516, 41 L.Ed.2d 398 (1974). Adopting the same principle, we hold that a chose in action arises under an occurrence—based insurance policy at the time of the covered loss—a conclusion that we reached many years ago. *See New v. German Ins. Co. of Freeport,* 5 Ind.App. 82, 85, 31 N.E. 475, 476 (Ind.Ct. App.1892) (after a loss has occurred policy becomes a chose in action assignable like any other chose in action). The lack of a specifically defined amount of recovery is not fatal to the determination that a chose in action exists. Here, the underlying claimants' continuous or repeated exposure to silica and other conditions that caused injury during the policy period triggered a right under the policy; a right in the insured to seek indemnification under policies. This right was a fixed claim, i.e. a chose in action, and was a freely transferable asset.

■ In connection with the 1986 transaction, the Reorganization Agreement provided:

> Allied–Signal and Henley shall use reasonable efforts to cause, in a manner mutually acceptable to Allied–Signal and Henley, all of Allied–Signal's right, title and interest in the Henley Assets [11] and all of its duties, obligations and responsibilities under the Henley Liabilities to be transferred to Henley or subsidiaries of Henley prior to the Distribution Date.... Whether or not all of the Henley Assets or the Henley Liabilities shall have been legally transferred to Henley prior to the Distribution Date, the parties agree that, as of the Distribution Date, Henley shall have, and shall be deemed to have acquired, complete and

---

It is agreed that such insurance as is afforded by the policy for bodily injury liability and property damage liability apply subject to the following provisions:

1. The words "caused by accident" are deleted and elsewhere the word "accident" is amended to read "occurrence."
2. "Occurrence" means an event which unexpectedly causes injury during the policy period, or a continuous or repeated exposure to conditions which unexpectedly causes injury to persons or tangible property during the policy period. All such exposure to substantially the same general conditions shall be deemed one occurrence.

*Joint App.* at 121, 145, 172, 198. In later policies, this language was changed in form, but not substance, and provided: " 'Occurrence' means: (A) An accident; or (B) Continuous or repeated exposure to conditions which results, during the policy period, in injury to persons or tangible property which is neither expected nor intended from the standpoint of the insured," and " 'occurrence' means an accident, including injurious exposure to conditions, which results while this policy is in force, in personal injury, property damage, or advertising offense which is neither expected nor intended from the standpoint of the insured." *Id.* at 374, 775.

11. The Reorganization Agreement defined Henley Assets as "collectively, all of the assets of Allied–Signal and its subsidiaries identified on Schedule I." *Joint App.* at 1425. Schedule I included the assets of the former Signal Business, The Wheelabrator Corporation. *Id.* at 1532.

sole beneficial ownership over all of the Henley Assets, together with all of Allied–Signal's rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of the Henley Liabilities, and all of Allied–Signal's duties, obligations and responsibilities incident thereto . . .

*Joint App.* at 1432–33.

Instead of seeking Insurers' consent to assignment for the 1996 transaction, U.S. Filter and Waste entered into a bi-lateral "Insurance Agreement" as part of the sale of the Blast Machine assets. *Id.* at 1789. The Insurance Agreement provided in part:

WTI and [Waste] hereby convey to [U.S. Filter] to the full extent permissible under the law and the relevant insurance policies any claim, chose in action, or other right WTI and/or [Waste] may have to insurance coverage under past and present insurance policies insuring WTI, [Waste] and/or any of either of their predecessors with respect to the Acquired Items to the extent such Acquired Items are assumed by or transferred to [U.S. Filter]. It is not the intention of the parties that [U.S. Filter] receive any greater right to insurance coverage than would have been available to WTI or [Waste] prior to execution of the Purchase Agreement. Further, in response to any reasonable request for cooperation, WTI and [Waste] agree to cooperate with [U.S. Filter] in any attempts by [U.S. Filter] to pursue such claim, chose in action or rights against WTI's and [Waste's] insurers, which insurers include insurers of WTI's and [Waste's] predecessors except to the extent such cooperation would be in violation of a [pending lawsuit].[12]

*Id.* at 1790.

The fact that U.S. Filter did not own or possess the Insurers' policies does not, as a matter of law, mean that U.S. Filter had no rights under those policies. The 1986 and the 1996 transactions transferred any right or chose in action related to the Wheelabrator blast business to Henley and U.S. Filter, respectively. The trial court did not err in concluding that U.S. Filter acquired rights and is entitled to seek insurance coverage under Insurers' policies still pending in this case.

## II. Consent to Transfer

Insurers next maintain that, even if coverage may transfer by means of these business transactions, the trial court erred in holding that the consent-to-assignment provisions do not, as a matter of law, preclude U.S. Filter, as a matter of law, from seeking coverage under the Insurers' policies.[13] Insurers argue that to allow U.S.

---

12. WTI and Waste also set forth that, since part of their obligation included cooperating in suits with U.S. Filter, U.S. Filter would pay any litigation expenses incurred by any of the three parties in connection with this obligation. *Joint App.* at 1791.

13. Hartford and NU & C, while joining in Travelers' brief, each filed their own brief to argue as follows: Hartford asserted that it issued policies to a company 34 years ago with a reasonable expectation that it was insuring the risk for that one company. Hartford contends that the trial court erred in granting summary judgment in favor of U.S.

Filter because U.S. Filter did not succeed to that company's insurance rights. Hartford further argues that U.S. Filter lacks rights under the Hartford policies because: (1) the three key transactions in this case (1985, 1986, and 1996) demonstrate that insurance rights were retained by the transferor and not transferred; and (2) in all the relevant transactions Hartford was never asked for, nor gave its consent to the assignment of the policies.

Likewise, NU & C appeals the trial court's grant of summary judgment to U.S. Filter contending that U.S. Filter has no rights to coverage under the policies because: (1) they

Filter access to these coverage rights would interfere with the freedom of contract provisions that have long been accepted in Indiana. Insurers contend that Indiana law requires enforcement of clear and unambiguous language in an insurance policy and that these non-assignment clauses are just such clear provisions, which this court should enforce.

■ The insurance policies govern the conditions of coverage. *Joint App.* 775, 813. Included in the Travelers policies is the following:

> Assignment. Assignment of interest under this policy shall not bind the [Insurer] company until its consent is endorsed hereon. If, however, the insured shall die or be adjudged bankrupt or insolvent while this policy is in force, this policy, unless cancelled, shall cover the insured's legal representative, as insured, but only while acting within the scope of his duties as such.

*Id.* at 340–41, 776. The other policies at issue contain comparable consent-to-assignment clauses. Insurers contend that this language bars efforts to transfer rights or assign rights under the policies absent the Insurers' consent, which all parties agree was not obtained. Appellants' Travelers' Br. at 23.

Here, the failure of the parties to comply with the "consent-to-transfer" language prevented the transfer of the *insurance policies* to Waste Management or U.S. Filter. However, that same language does not preclude U.S. Filter from seeking coverage from an Insurer for lawsuits filed by claimants who contend that they were exposed to silica from the Wheelabrator blast during that Insurer's policy period.

are not named insureds under the post–1986 policies; and (2) the policies contained a

Insurance commentators echo this reasoning that the consent-to-transfer clause does not preclude post-loss assignment:

> the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a monetary claim. The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.

3 Lee R. Russ and Thomas F. Segalla, Couch on Insurance, § 35:7 at 2 (3d ed. Supp.2006) (footnotes omitted).

> As a general principle, a clause restricting assignment does not in any way limit the policyholder's power to make an assignment of the rights under the policy—consisting of the right to receive the proceeds of the policy—after a loss has occurred. The reasoning here is that once a loss occurs, an assignment of the policyholder's rights regarding that loss in no way materially increases the risk to the insurer. After a loss occurs, the indemnity policy is no longer an executory contract of insurance. It is now a vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property.

"consent to assignment" clause with which U.S. Filter Plaintiffs did not comply.

17 WILLISTON ON CONTRACTS § 49:126 at 124–25 (4th ed.) (footnotes omitted).

> General stipulations in policies prohibiting their assignment except with the insurer's consent or upon giving notice, or like conditions, apply only to assignments before loss, and accordingly do not prevent an assignment of a claim or an interest in insurance money then due. Indeed, a specific provision against an assignment after loss is generally held unenforceable, as inconsistent with the covenant of indemnity or the right to assign a claim for money due, and as contrary to public policy,

44 AM.JUR. 2D INSURANCE § 787 (2004).

■ Stated differently, as a matter of public policy, the non-assignment clause in the Insurers' insurance policies operates to prevent assignment of the right under the insurance policy only where such assignment would increase the risks incurred. *See Conrad Bros. v. John Deere Co.*, 640 N.W.2d 231, 237 (Iowa 2001) (the need to protect the insurer no longer exists after the insured sustains the loss because the liability is fixed); *see also B.S.B. Diversified Co. v. Am. Motorists Ins. Co.*, 947 F.Supp. 1476, 1481 (W.D.Wash.1996) (liability assigned by contract did not increase insurer's risk when duty to indemnify and defend related to events that occurred prior to transfer). Where the assignment is of the right to recover against the policy for a loss that has already occurred, there is no increase in risk to the insurer.

Here, the Plaintiffs' predecessors and affiliates compensated the Insurers for insuring the risk associated with the operation of the Wheelabrator blast. Thus, to now hold the Insurers responsible for the liability arising under that risk only imposes on the Insurers the liability that they agreed to insure and for which they were already compensated. Indeed, any contrary holding would provide an unfair windfall for Insurers.

The dissent in *Henkel* explains this situation as follows:

> An insurance contract is often an asymmetrical relationship: an insured will have fully performed, paying premiums to the insurer, long before the insurer is called on to perform at all. It makes no sense to say that any part of the insurer's obligation is destroyed by transactions that have nothing to do with the insured-against events or the insurer's obligations. If the injuries for which a claim is brought occur during the policy period, the insurer is obliged to cover the injury, and the insured has a right to recover benefits from the insurer. Any subsequent transfer of this right to recover has no effect on the insurer's contractual obligations. An insurer should not be able to evade these responsibilities by inserting a no-assignment clause into the insurance contract.

*Henkel*, 62 P.3d at 81 (Moreno, J., dissenting).

Insurers contend that to allow U.S. Filter coverage under these insurance policies would create the unfair burden of requiring them to defend an entity who was not a party to the insurance policy and, possibly, to defend multiple entities. While we acknowledge that there may be an incidental burden arising from the necessity to defend an entity other than the named insured, such burden is outweighed by the benefits of promoting the free transferability of assets and compensating those injured as a result of an insured risk.

We find persuasive the considerations offered by *amicus curiae* National Solid Wastes Management Association ("NWA") and Indiana Petroleum Marketers and Convenience Store Association ("IPCA"), who offer that the smooth flow of assets from one entity to another by way of merger or acquisition is integral to the functioning of a modern free market econ-

omy. The fact that liabilities commonly are moved from one entity to another in mergers and acquisitions has a societal impact both positive and negative. When unexpected liabilities overwhelm acquirers, jobs and savings are lost. Liabilities, especially "long-tail liabilities" (as is the case with asbestos, silica, and the like) usually are unexpected and have not been priced into the bargain. On the positive side, allowing liabilities to survive, protects innocent victims, and aligns the costs and benefits of economic activity. If liabilities could be shed by way of transaction, there would be a temptation to engage in evasive reshuffling that could leave the public to bear the externalities.

The main means through which entities insure against the unexpected losses caused by liability is to purchase insurance. Insurance must be broad to serve its function. It would be reckless to undertake an acquisition if it were impossible for a business to insure against historic liabilities that may come with the new asset, especially when a purchaser could not purchase insurance to retroactively cover a past loss. *See Henkel,* 62 P.3d at 80 (Moreno, J., dissenting) ("It is highly unlikely that a successor company would be able to obtain insurance coverage for injuries *that have already occurred* before the successor's acquisition of the business.") (emphasis in original).

An insurance company would be foolish to consent to the transfer of insurance if,

by withholding such consent, it could shed itself of past liability. Further, it would be unfair for a company that retains its assets to have coverage for a latent injury while one who acquires the same insured assets would get no comparable coverage for past occurrences. This failure of insurance to follow would essentially be a restraint on alienation, which is not favored in law. *See First Sav. and Loan Ass'n of Cent. Indiana v. Treaster,* 490 N.E.2d 1149, 1152 (Ind.Ct.App.1986), *trans. denied.*

The realities of the market place must ensure that assets are freely transferable. If an insurer could effectively prevent such transfers by failing to consent to the assignment of a liability policy (and no insurer would agree to the assignment where it could avoid liability for insured occurrences by refusing to consent), this public policy would be undermined.

▆▆▆▆ Literally interpreted, the non-assignment clause would deprive any successor in interest to the named insured of the protection of the insurance policy, including executors of wills and administrators of decedents' estates, trustees under *inter vivos* and testamentary trust agreements, attorneys-in-fact under springing powers of attorney, and transferees in corporate mergers, spin-offs, and transfers.[14]

### III. Waste Management

Finally, Waste Management cross-appeals the trial court's denial of summary

---

14. While we base our ruling on public policy grounds, the alternate basis of the ambiguity of the non-assignment clause should not be ignored. If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Hartford Acc. & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind. Ct.App.1997), *trans. denied* (1998). Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* Where there is ambiguity, insurance policies

are to be construed strictly against the insurer. *Id.* A division of authority among courts of various jurisdictions as to the meaning of the same form language in liability policy is evidence that more than one reasonable interpretation is possible. *Id.* Since insurance policies are construed to effect coverage not to deny it, since any ambiguity must be resolved in favor of the insured, and since the fact that a number of courts have found non-assignment clauses to be ambiguous, they may be ambiguous as a matter of law.

judgment in its favor and grant of summary judgment in favor of Insurers, challenging whether the trial court could summarily divest it of coverage rights even though no party requested such relief and no supportive evidence was introduced. Specifically, Waste Management argues that the trial court improperly granted summary judgment in favor of Insurers on an issue the trial court should not have considered, i.e., as between U.S. Filter and Waste Management, that U.S. Filter holds all the insurance coverage rights exclusively.

■ "This court has held that '[n]o provision of Trial Rule 56(C) authorizes the entry of summary judgment sua sponte' and 'the practice should be used only rarely and with caution.'" *Mackey v. Estate of Mackey*, 858 N.E.2d 1038, 1042 (Ind.Ct.App.2006) (quoting *Jones v. Berlove*, 490 N.E.2d 393, 395 (Ind.Ct.App. 1986)). "The paramount consideration is whether the party against whom summary judgment has been entered had notice and an adequate opportunity to prepare and present materials in opposition." *Id.* (quoting *Jones*, 490 N.E.2d at 395). Thus the question here is whether Waste Management had notice and an adequate opportunity to prepare and present evidence concerning the determination of rights as between itself and U.S. Filter.

The Agreed Amended Case Management Order, instructed the parties to "engage in an initial phase ('Phase I') of discovery and motion practice limited to determining *whether the Plaintiffs* have a right to seek insurance coverage or proceeds under each of the defendants' insurance policies listed on Exhibit A to Plaintiffs' First Amended Complaint." *Cross–Appellant Waste's App.* at 2 (emphasis added). The trial court did not differentiate between the Plaintiffs and deferred all other issues until the completion of Phase I. *Id.* By its own words, the trial court revealed no intent to determine the rights as *between* the Plaintiffs.

The trial court's summary judgment entry, however, did adjudicate the rights of the respective plaintiffs in ruling that the Waste Management Plaintiffs transferred all rights and liabilities associated with the Wheelabrator to U.S. Filter. The Waste Management Plaintiffs had no notice or opportunity to present evidence concerning such determination. Accordingly, we hold that the trial court erred in entering summary judgment in favor of the Insurers and against Waste Management. We vacate the summary judgment and remand for further proceedings.

Affirmed in part, vacated in part, and remanded.

SHARPNACK, J., and NAJAM, J., concur.