Counsel of Record are listed at final pages.

# In the
# Indiana Supreme Court

**FILED**

Oct 15 2008, 3:09 pm

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

### No. 49S02-0712-CV-596

TRAVELERS CASUALTY AND SURETY
COMPANY, ET AL.,

*Appellants (Defendants below),*

v.

UNITED STATES FILTER CORPORATION N/K/A
WATER APPLICATIONS & SYSTEMS
CORPORATION, U.S. FILTER SURFACE
PREPARATION GROUP INC. N/K/A
INTERNATIONAL SURFACE PREPARATION
GROUP, INC., WHEELABRATOR
TECHNOLOGIES INC., WASTE MANAGEMENT
HOLDINGS, INC. AND RESCO HOLDINGS,
L.L.C.,

*Appellees (Plaintiffs below).*

Interlocutory Appeal from the Marion Superior Court No. 1, No. 49D01-0409-PL-1745
The Honorable Cale Bradford, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0604-CV-289

**October 15, 2008**

**Shepard, Chief Justice.**

Five corporations seek insurance coverage from insurers who issued liability policies for their predecessors. The underlying litigation involves bodily injury claims relating to the operation of an industrial blast machine. The corporations say that coverage rights passed to them through the same corporate transactions that brought them the blast machine assets. The trial court agreed and granted summary judgment to the current holder of the assets.

Each of the implicated insurance policies contains a provision that bars assignment of the policy without the consent of the insurer. We hold that consent is required for any assignment of policy rights, unless the assignment occurs after an identifiable loss, in which case the right to receive payment on that claim may be transferred without consent. Because the corporations neither obtained consent nor made a post-loss assignment, we direct judgment for the insurers.

## Facts and Procedural History

On June 18, 2004, appellees United States Filter Corp. and United States Filter Surface Preparation Group, Inc. (collectively "U.S. Filter") filed a complaint against numerous insurance companies (collectively "Insurers"), most of which remain as appellants, seeking defense and indemnification for underlying product liability claims. The underlying claims involve bodily injuries allegedly caused by the claimants' exposure to silica from working near the Wheelabrator blast machine.[1] U.S. Filter sought coverage under several occurrence-based comprehensive general liability (CGL) policies issued to its predecessors-in-interest.

Appellees Wheelabrator Technologies, Inc., Resco Holdings, L.L.C., and Waste Management Holdings, Inc. (collectively "Waste Management"), intervened on October 22, 2004, seeking defense and indemnity coverage for their own underlying Wheelabrator injury claims. U.S. Filter and Waste Management then jointly filed two amended complaints. The trial court and parties agreed to bifurcate the proceedings, limiting the initial phase to "determining whether the Plaintiffs have a right to seek insurance coverage or proceeds under each of the defendants' insurance policies" and deferring all other issues until a later phase of the litigation. (Waste Mgmt. App. at 1-2.)

---

[1] The Wheelabrator blast machine

> is an airless blast machine, developed to mechanically clean pieces of metal in a way that, relative to traditional sandblasting methods, dramatically reduces the use of manpower and the release of silica into the work environment. The machine operates by use of a wheel with flanges that hurls 'shot' at the molded metal. The shot removes sand – and in other applications removes rust, scaling or other material – that has adhered to the metal.

(Jt. App. at 272-73.)

A brief period of discovery revealed that the Wheelabrator blast machine corporate assets have a complex ownership history spanning nearly a hundred years. By January 1986, Wheelabrator Corp. ("Wheelabrator III" [2]), a subsidiary of Signal Applied Technologies, Inc. ("SAT"), owned the Wheelabrator machine assets and liabilities. SAT merged into Allied Corp. on January 16, 1986, making Wheelabrator III a subsidiary of Allied. On February 26, 1986, Allied-Signal, Inc., the parent of Allied, agreed to spin-off several assets, including Wheelabrator III, to The Henley Group, Inc. ("Henley"), another subsidiary of Allied-Signal. The spin-off was accomplished on May 21, 1986, when Allied assigned its stock in Wheelabrator III to Newco (Allied), Inc., a subsidiary of Henley.

As a result of name changes, Henley became Wheelabrator Technologies, Inc. ("WTI") in 1989. On September 7, 1990, Waste Management, Inc. acquired majority ownership in WTI.[3] Five years later, Wheelabrator III merged with another WTI subsidiary to become Wheelabrator Water Technologies, Inc. The former Wheelabrator III assets became the Wheelabrator Corporation Division of the newly formed subsidiary. On September 14, 1996, WTI agreed to sell the assets of the Wheelabrator Corporation Division to United States Filter Corp.

As a result of the Wheelabrator's long history, Insurers have issued over eighty policies that are potentially implicated by the underlying claims. The policies each contain a provision prohibiting assignment without the consent of the insurer. The provision takes two forms: (A) "Assignment. Assignment of interest under this policy shall not bind the [insurer] until its consent is endorsed hereon." and (B) "TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY. Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." (Jt. App. at 1776-79.) The parties' efforts in Phase I of the litigation have focused on the significance of these provisions in relation to the Wheelabrator blast machine ownership history.

---

[2] Two of the earlier corporate predecessors were also named Wheelabrator Corporation, and throughout this litigation they have been referred to as "Wheelabrator I" and "Wheelabrator II." To avoid confusion, we use the same abbreviations.

[3] Waste Management changed its name to WMX Technologies, Inc. in 1993, and then changed back to Waste Management, Inc. in 1997. (Nat'l Union App. at 3464.)

On October 21, 2005, U.S. Filter, Waste Management, and the Insurers each moved for summary judgment as to Phase I issues. The trial court heard arguments on the motions and later granted summary judgment to U.S. Filter but denied it to Waste Management. (Id. at 57-58.) The court explained:

> [T]he Waste Management Plaintiffs have transferred all insurance rights and liabilities associated with the now infamous machine at issue to Plaintiff United States Filter Corporation . . . .
>
> a. United States Filter Corporation has a right to seek insurance coverage or proceeds under the insurance policies still pending in this case.
>
> b. The clauses in the Insurance Policies pertaining to assignments do not apply as a matter of law or fact to the rights of Plaintiff United States Filter Corporation.

(Id.)

The Insurers petitioned for an interlocutory appeal, which the Court of Appeals allowed. Affirming the trial court as to U.S. Filter, but reversing as to Waste Management, the Court of Appeals held that a chose in action arose under the occurrence-based insurance policies at the moment of each loss – saying that the loss was each claimant's initial exposure to silica. As freely transferable assets, the choses in action carrying coverage rights then passed to Waste Management and U.S. Filter via corporate transactions. Travelers Cas. & Sur. Co. v. U.S. Filter Corp., 870 N.E.2d 529, 541 (Ind. Ct. App. 2007), vacated. The Court of Appeals distinguished transfer of the rights under the insurance policies from the transfer of the policies themselves, only the latter implicating the consent-to-assignment provisions. In a footnote, the court also indicated an additional ground for its decision might be ambiguity in the consent-to-assignment provisions, which triggers the rule of strict construction against insurers. Id. at 545 n.14. We granted transfer and now reverse.

**Standard of Review**

When reviewing a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court. Carie v. PSI Energy, Inc., 715 N.E.2d 853, 855 (Ind. 1999).

4

We must decide whether there is a genuine issue of material fact that precludes summary judgment and, if not, whether the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We also construe the designated evidence in a light most favorable to the non-moving party. Havens v. Ritchey, 582 N.E.2d 792, 795 (Ind. 1991).

Although the parties submitted an exhaustive record, we find no disputes of material fact respecting the Phase I issue, and we resolve the following questions as a matter of law.

## I. The Insurance Rights Did Not Transfer

The Insurers, led by Travelers, contend that the Wheelabrator's previous owners did not transfer insurance rights through corporate transactions to reach Waste Management and U.S. Filter. (Travelers Appellants' Br. at 18-21; Hartford Supplemental Appellants' Br. at 6.) Waste Management and U.S. Filter take the opposite view, arguing that rights under the policies, as distinguished from the policies themselves, properly transferred down the line of corporate succession. (Waste Mgmt. Appellees' Br. at 8-11, 16; U.S. Filter Appellees' Br. at 2-7, 10.)

### A. The Complete Policies Were Not Assigned

As two amici curiae correctly observe, the free flow of capital and assets between business entities is important for the vitality of national and international markets. (Nat'l Solid Wastes Mgmt. Ass'n Br. at 2.) In the course of normal business, companies engage in a variety of transactions to exchange assets and liabilities. For example, mergers and consolidations generally result in the transfer of all of the participants' assets and liabilities to the surviving corporation, including insurance coverage rights. See Ind. Code Ann. § 23-1-40-6 (West 2007). Alternatively, asset sales transfer the assets and liabilities specifically designated by contract in exchange for money, shares, or other property. See id. ch. 23-1-41. An insurance policy, like other contracts generally, may be transferred between business entities as part of one of these structured transactions.

The preliminary question for our review is whether the predecessors-in-interest of the Wheelabrator blast machine attempted to transfer the insurance policies to each successive owner, and ultimately, to Waste Management and U.S. Filter. The answer to this question depends on the intent expressed in the written agreements governing each transaction. The parties focus on the impact of two specific transactions: the 1986 Henley spin-off and the 1996 asset sale between Waste Management and U.S. Filter.

Looking first at the 1986 transactions resulting in the Henley spin-off, it seems that Allied-Signal did not attempt to transfer the relevant insurance policies to Henley. Article I of the General Assignment provides:

> Assignor hereby sells, transfers, assigns, releases and sets over unto Assignee all of Assignor's right, title and interest in and to all of the assets of Assignor identified in Annex I hereto (the "Assets").

> To the extent that the assignment of any contract, agreement, license or authorization to be assigned to Assignee pursuant to the Distribution Agreement [of February 26, 1986] shall require the consent of any other party . . . this instrument shall not constitute a contract to assign the same if an attempted assignment would constitute a breach thereof . . . . The Assignor and Assignee shall use reasonable efforts to obtain consent to any such assignment.

(Jt. App. at 1611-12.) Annex I lists Wheelabrator III but makes no mention of any insurance policies. (Id. at 1614-18.)

While it is clear that Allied-Signal transferred to Henley the entire Wheelabrator III business, including all of its individual assets and liabilities, that effort did not include all of the relevant insurance policies. When SAT merged into Allied, most of the policies covering the Wheelabrator blast machine previously held by SAT transferred to Allied automatically. Because Allied did not list the policies as an asset to be transferred to Henley in Annex I, or in any other document that is part of the record before us, we conclude that the parties did not transfer the insurance policies from Allied to Henley on May 21, 1986.[4]

---

[4] This seems to leave Allied holding title to all of the insurance policies written for its predecessors-in-interest to the Wheelabrator blast machine assets.

6

The parties to the 1996 transaction executed a more explicit contract. Waste Management, through WTI, agreed to transfer the Wheelabrator blast machine assets to U.S. Filter, pursuant to which they entered into an Insurance Agreement. The Agreement states:

> [T]he parties wish to assure that after the Closing Date, [U.S. Filter] possesses all the rights to insurance proceeds and/or insuring agreements which WTI possessed prior to the Closing Date concerning the Subsidiaries, Domestic Assets, Divisions and Liabilities to be transferred to [U.S. Filter] pursuant to the Purchase Agreement (together, the "Acquired Items").
>
> . . .
>
> 3. WTI and [Waste Management] hereby convey to [U.S. Filter] to the full extent permissible under the law and the relevant insurance policies any claim, chose in action, or other right WTI and/or [Waste Management] may have to insurance coverage under past and present insurance policies insuring WTI, [Waste Management] and/or any of either of their predecessors with respect to the Acquired Items to the extent such Acquired Items are assumed by or transferred to [U.S. Filter].

(Waste Mgmt. App. at 886-87.) By its plain language, the Insurance Agreement transfers to U.S. Filter all insurance policies and proceeds held by Waste Management covering the Wheelabrator blast assets. At most, this transaction appears to transfer all policies entered into after the May 1986 Henley spin-off.

Because of the intricacy of these transactions, we will assume for the sake of argument that the former owners of the Wheelabrator blast machine did attempt to transfer all relevant insurance policies at both of these moments. For the transfers to succeed, the predecessors must have complied with those policy provisions governing assignment.

The Insurers assert that all of the insurance policies contained the clauses requiring their consent to execute a valid assignment, with which Waste Management, U.S. Filter, and their predecessors did not comply. (Travelers Appellants' Br. at 21-24; Nat'l Union Appellants' Br. at 12-14; Hartford Supplemental Appellants' Br. at 12-14.) U.S. Filter and Waste Management do not contest these assertions but raise other arguments we will address shortly.

7

Because the policies require insurer consent before a valid assignment can be made, and that consent was not given, we hold that the several insurance policies at issue here were not transferred in any of the corporate transactions involving the Wheelabrator blast machine assets.

## B. Specific Claims Were Not Assigned

Even though the complete policies did not transfer, U.S. Filter and Waste Management argue that certain claims under the policies did transfer as choses in action, notwithstanding the consent-to-assignment provisions. (Waste Mgmt. Appellees' Br. at 21-42; U.S. Filter Appellees' Br. at 11-33.) The Insurers contend that the consent-to-assignment provisions apply to any assignment of rights under the policy and that no choses in action existed at the time of the corporate transactions. (Travelers Reply Br. at 3-11; Nat'l Union Reply Br. at 2-17.)

Consent-to-assignment clauses are virtually boilerplate in most contracts of insurance. Insurance providers have a legitimate business interest in restraining assignment – these provisions protect them from a material increase in risk for which they did not bargain, specifically because of a change in the nature of the insured. See Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co., 100 F.2d 441, 444-46 (8th Cir. 1939), cert. denied, 306 U.S. 658 (1939). Consequently, a consent-to-assignment clause is generally enforced against attempted transfers of the policy itself, as we demonstrated above. 17 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 49:126 (4th ed. 2000).

Courts widely recognize an exception to the enforcement of consent-to-assignment clauses for assignments made after a loss has occurred. Conrad Bros. v. John Deere Ins. Co., 640 N.W.2d 231 (Iowa 2001). See, e.g., New v. German Ins. Co. of Freeport, 5 Ind. App. 82, 85, 31 N.E. 475, 476 (Ind. Ct. App. 1892) ("after a loss has occurred the policy becomes a chose in action, and is assignable as other choses in action are"). The post-loss exception is justified because

> once a loss occurs, an assignment of the policyholder's rights regarding that loss
> in no way materially increases the risk to the insurer. After a loss occurs, the
> indemnity policy is no longer an executory contract of insurance. It is now a

> vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property.

Williston & Lord, supra, § 49:126 (footnotes omitted).

For example, in Conrad Bros., an insured's mortgagee brought suit against the issuer of a casualty insurance policy to recover the replacement cost of the insured's business property after a severe windstorm. 640 N.W.2d at 233-35. The Iowa Supreme Court held that because the assignment occurred after the loss, the right to seek replacement costs validly transferred to the mortgagee. Id. at 238.

What makes this case a little different is the nature of the losses insured. All of the policies at issue are occurrence-based CGL policies or excess policies deriving therefrom. Among other things, they provide the named insured indemnity coverage and a defense for the bodily injury or property damage claims of third parties resulting from the use of the insured's products during the policy period. Even if injuries do not manifest themselves for years, they generally trigger coverage. See Eli Lilly & Co. v. Home Ins. Co., 482 N.E.2d 467, 471 (Ind. 1985) (adopting the multiple trigger interpretation of occurrence-based insurance policies in the delayed manifestation context).

Therein lies the rub. Unlike an instantly incurred loss, such as that resulting from windstorm or fire, the underlying third-party claims allege injuries that apparently occurred but went unreported, even unrealized, for years. None of the parties contend that anyone knew of the alleged injuries when the relevant transactions took place involving the Wheelabrator blast machine assets. The question then is whether such occurred but not yet reported losses can form the basis of choses in action that U.S. Filter and Waste Management say transferred to them through the Wheelabrator predecessors-in-interest.

Some courts facing similar questions have not distinguished third-party losses in this way, and they continue to apply the rule allowing post-loss assignment of insurance claims. See, e.g., Northern Ins. Co. of New York v. Allied Mut. Ins. Co., 955 F.2d 1353 (9th Cir. 1992) (indemnity and defense rights for third-party claims held to follow transfer of liabilities in

9

product-line successor liability jurisdictions); <u>Egger v. Gulf Ins. Co.</u>, 903 A.2d 1219 (Pa. 2006) (insurer's obligation to provide excess coverage arose on the date of the injury to the third party, regardless of whether assignment occurred before or after the jury verdict fixing the amount of liability); <u>Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.</u>, 588 N.W.2d 756 (Minn. Ct. App. 1999) (oil company could seek indemnity and defense from its predecessor's liability insurer for environmental clean-up liabilities stemming from predecessor's activities, even though contamination pre-dated environmental legislation).

Yet, cases have also gone the other way. One such decision comes from the California Supreme Court, <u>Henkel Corp. v. Hartford Accident & Indemnity Co.</u>, 62 P.3d 69 (Cal. 2003). Henkel acquired certain metallic chemical product assets through a stock sale and merger with another company that had acquired those assets by contract. Several years later, claims were filed against Henkel for bodily injuries allegedly caused by the metallic chemicals. Henkel settled and sought contribution from its own insurers and from the insurers of its predecessors-in-interest. <u>Id.</u> at 72. The California Supreme Court first determined that because Henkel assumed the tort liability by contract, any rights to its predecessors' insurance would turn on interpretation of those contracts. <u>Id.</u> at 74. The contracts each contained consent-to-assignment provisions with which Henkel had not complied, yet Henkel argued that the policy benefits can be assigned post-loss without receiving consent. The Court disagreed and held that the claims had not become an assignable chose in action because they "had not been reduced to a sum of money due or to become due under the policy." <u>Id.</u> at 75.

The Court also addressed Henkel's argument that assignment without consent should be permitted because it would not place additional risk on the insurers.

> An additional burden may arise whenever the predecessor corporation still exists or can be revived because of the ubiquitous potential for disputes over the existence and scope of the assignment. If both assignor and assignee were to claim the right to defense, the insurer might effectively be forced to undertake the burden of defending both parties.

<u>Id.</u> (citation omitted). Because of these potential risks to the insurers, the Court upheld their contractual right to accept or reject the assignment.

10

The California Supreme Court's logic in Henkel seems about right. At a minimum, for an insured loss to generate an assignable coverage benefit, the loss must be identifiable with some precision. It must be fixed, not speculative. See Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 172-73 (2nd Cir. 2006) (agreeing with district court judge who held fixed losses assignable and speculative losses not). We doubt that much, if any, authority exists for the proposition that an "unliquidated inchoate potential for coverage" can be freely transferred without the insurer's consent. (Travelers Appellants' Br. at 30.)

This rule draws as much from the law on choses in action as from the law on insurance policies. A right not currently held is not a chose in action assignable at law. It follows that a chose in action only transfers in these circumstances if it is assigned at a moment when the policyholder could have brought its own action against the insurer for coverage. Under the liability policies implicated here, that moment does not arrive until a claim is made against the insured. Put another way, at a minimum the losses must have been reported to give rise to a chose in action.

The potential for assignment to increase the risk to insurers is also a significant factor. The indemnity risk will remain largely the same regardless of who holds the policy rights – that is, the risk that a jury on some future date will assess damages for the bodily injuries caused by the Wheelabrator blast machine. On the other hand, the risk of being called to court to defend more than just the underlying claims seems substantial, as this dispute soundly demonstrates.

Notwithstanding the post-loss exception, we read the consent-to-assignment provisions to apply to coverage transfers of any scope because it is hard to see the practical difference between assignment of the entire policy and assignment of a single claim.[5] If a claim was assigned in an asset sale, and the assignment encompassed indemnification and defense coverage, what does it not cover from the assignee's perspective? The assignee is receiving everything under the policy the assignee could possibly want, especially since any claim receives the benefit of the full

---

[5] Because we construe the consent provisions to the broadest extent possible, we need not address whether the language is ambiguous.

11

policy limits. Moreover, the assignment of a pre-loss claim, or set of claims, can be just as risky for the insurer as assignment of an entire policy.

Corporate managers engaged in asset transactions that may involve occurred-but-not-yet-reported losses have other means available to insure against the losses. For example, the asset purchaser could negotiate for indemnification of losses that have occurred up to the moment of exchange. If that strategy were followed over time, a distant successor could still benefit from the original policyholder's liability insurance via indemnity claims made up the chain of corporate succession. Or, if the seller will not indemnify potential losses, the buyer can negotiate the price down to compensate for the increased risk of liability.

To the extent the alleged Wheelabrator blast machine injuries had occurred but had not yet been reported at the time of the relevant transactions, they did not constitute an assignable chose in action. Accordingly, U.S. Filter and Waste Management do not have a right to seek coverage under their predecessors' CGL policies for these claims.

## II. Prior Participation Does Not Prevent Insurers from Denying Coverage Now

U.S. Filter and Waste Management argue for the reasonableness of their position by referring us to documentation from earlier, apparently unrelated claims in which at least Travelers participated in the defense. (U.S. Filter Appellees' Br. at 28-30; Waste Mgmt. Appellees' Br. at 29-32.) Travelers contends that it only participated in the defense of claims brought against its named insureds, not U.S. Filter and Waste Management, and that in any event it reserved its right to withdraw from the defense. (Travelers Reply Br. at 13-15.)

We find little worthy of pursuit regarding these contentions, except to say that even if Travelers or other Insurers participated in an earlier settlement of these sorts of claims, those agreements to defend appear to have included a valid reservation of the right to withdraw later. (See, e.g., U.S. Filter App. at 477-83.) And since U.S. Filter and Waste Management did not

12

show some kind of detrimental reliance based on the defense agreements, they provide little help in demonstrating the existence of rights to the Wheelabrator predecessors' insurance.

## Conclusion

We reverse the trial court's summary judgment determination and direct entry of judgment for the Insurers on the issues at contest in the present appeal.

Dickson, Sullivan, and Rucker, JJ., concur.
Boehm, J., not participating.

13

## Counsel of Record:

ATTORNEYS FOR APPELLANTS TRAVELERS CASUALTY AND SURETY COMPANY AND THE TRAVELERS INDEMNITY COMPANY
Richard A. Rocap
Indianapolis, Indiana

Mary Massaron Ross
Detroit, Michigan

Charles W. Browning
Stephen P. Brown
Michael D. Almassian
Bloomfield Hills, Michigan

ATTORNEYS FOR APPELLANT ALLSTATE INSURANCE COMPANY
Norman T. Funk
Rori L. Goldman
Indianapolis, Indiana

Robert R. Anderson III
Allison G. Margolies
Chicago, Illinois

ATTORNEY FOR APPELLANT CERTAIN SOLVENT INSURANCE COMPANIES OF THE LLOYD'S OF LONDON MARKET COMPANIES
Donald G. Orzeske
Indianapolis, Indiana

ATTORNEY FOR APPELLANT CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND THE LLOYD'S OF LONDON MARKET COMPANIES
P. Russell Perdew
Chicago, Illinois

ATTORNEYS FOR APPELLANTS CONTINENTAL INSURANCE COMPANY, ET AL.
Mary K. Reeder
Indianapolis, Indiana

David E. Schoenfeld
Irving C. Faber
Sarah D. McTurnan
Chicago, Illinois

ATTORNEYS FOR APPELLANT EMPLOYERS MUTUAL CASUALTY COMPANY
G. Ronald Heath
Sean T. White
Indianapolis, Indiana

Jan M. Michaels
Scott M. Salerno

ATTORNEYS FOR APPELLEES UNITED STATES FILTER CORPORATION n/k/a WATER APPLICATIONS & SYSTEMS CORPORATION, ET AL.
Stanley C. Fickle
Robert D. MacGill
Charles P. Edwards
T. Joseph Wendt
Indianapolis, Indiana

Robert D. Chesler
Roseland, New Jersey

ATTORNEYS FOR APPELLEES WHEELABRATOR TECHNOLOGIES, INC., ET AL.
Fred R. Biesecker
Brent W. Huber
Brian E. Bailey
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION AND INDIANA PETROLEUM MARKETERS AND CONVENIENCE STORES ASSOCIATION
George M. Plews
Christopher J. Braun
Jeffrey D. Featherstun
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE UNITED POLICYHOLDERS, INDIANA MANUFACTURERS ASSOCIATION, AND DUKE ENERGY INDIANA, INC.
Kevin M. Toner
Indianapolis, Indiana

Charles M. Denton II
Eric C. Fleetham
Grand Rapids, Michigan

Eric M. Cavanaugh
Plainfield, Indiana

William G. Passannante
Cort T. Malone
Brittany Hillman
New York, New York

Amy Bach
Mill Valley, California

14

Stephen A. Skardon
Chicago, Illinois

Attorney for Appellant Federal Insurance
Company
Stephen J. Peters
Indianapolis, Indiana

Attorneys for Appellants Hartford Accident
and Indemnity Company, et al.
Donald B. Kite, Sr.
Indianapolis, Indiana

James P. Ruggeri
Jeffrey D. Pariser
Catherine E. Stetson
Washington, D.C.

Attorneys for Appellant National Union Fire
Insurance Company of Pittsburgh, Pennsylvania
Adrian A. Allen
C. Joseph Russell
Indianapolis, Indiana

Samuel B. Isaacson
Sonya D. Naar
James D. Roberts
Chicago, Illinois

Attorneys for Appellant TIG Insurance Company
David A. Temple
Mathew J. Schafer
Indianapolis, Indiana

Louis G. Corsi
Joseph Tomaino
New York, New York

Attorneys for Appellants Westchester Fire
Insurance Company, et al.
Scott A. Harkness
Bruce L. Kamplain
Indianapolis, Indiana

Lizbeth J. Lemke
Chicago, Illinois

Attorney for Appellant Zurich International
(Bermuda), Ltd.
David I. Rubin
Indianapolis, Indiana

Attorneys for Amicus Curiae Complex Insurance
Claims Litigation Association
Laura A. Foggan
Katherine L. Van Pelt

Benjamin J. Theisman
Washington, D.C.

Michael B. Cracraft
Philip B. McKiernan
Joseph M. Hendel
Indianapolis, Indiana