# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

PCS Nitrogen, Inc., Petitioner,

v.

Continental Casualty Company, Admiral Insurance Company, United States Fire Insurance Company, ACE Property & Casualty Insurance Company, Certain Underwriters at Lloyd's London, the Aviva Companies, the Winterthur Companies, Certain London Market Insurance Companies, Providence Washington Insurance Company (as Successor in Interest by way of Merger to Seaton Insurance Company, f/k/a Unigard Security Insurance, f/k/a Unigard Mutual Insurance Company), Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Lexington Insurance Company, Starr Indemnity & Liability Company (f/k/a Republic Insurance Company), First State Insurance Company, and Century Indemnity Company (f/k/a California Union Insurance Company and Insurance Company of North America), Defendants,

Of which Continental Casualty Company, Admiral Insurance Company, United States Fire Insurance Company, Certain Underwriters at Lloyd's London, the Aviva Companies, the Winterthur Companies, Certain London Market Insurance Companies, Providence Washington Insurance Company (as Successor in Interest by way of Merger to Seaton Insurance Company, f/k/a Unigard Security Insurance, f/k/a Unigard Mutual Insurance Company), Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Lexington Insurance Company, Starr Indemnity & Liability Company (f/k/a Republic Insurance Company), and First State Insurance Company are the Respondents.

Appellate Case No. 2020-000445

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

Appeal from Charleston County
G. Thomas Cooper Jr., Circuit Court Judge

Opinion No. 28093
Heard June 16, 2021 – Filed April 13, 2022

REVERSED AND REMANDED

William Howell Morrison, of Haynsworth Sinkler Boyd, PA, of Charleston; Sarah P. Spruill, of Haynsworth Sinkler Boyd, PA, of Greenville; and Michael H. Ginsberg and Matthew R. Divelbiss, of Pittsburgh, PA, for Petitioner.

Morgan S. Templeton, of Wall Templeton & Haldrup, PA, of Charleston, and Patrick F. Hofer, of Washington, D.C., for Respondent Continental Casualty Company; J.R. Murphy, Adam J. Neil, and Wesley B. Sawyer, of Murphy & Grantland, PA, of Columbia, for Respondent Admiral Insurance Company; Christian Stegmaier and R. Scott Wallinger Jr., of Collins & Lacy, PC, of Columbia, and John S. Favate, of Springfield, NJ, for Respondent United States Fire Insurance Company; Edward K. Pritchard III, of Pritchard Law Group, LLC, of Charleston, and Richard McDermott and Seth M. Jaffe, of Chicago, IL, for Respondents Certain Underwriters at Lloyd's London, the Aviva Companies, the Winterthur Companies, Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), and Starr Indemnity & Liability Company (f/k/a Republic Insurance Company); John T.

Lay Jr. and Laura W. Jordan, of Gallivan, White & Boyd, PA, of Columbia, and Helen Franzese, of London, U.K., for Respondent Certain London Market Insurance Companies; Elizabeth J. Palmer, of Rosen Hagood, LLC, of Charleston, and Molly Poag and Harry Lee, of Washington, D.C., for Respondent Providence Washington Insurance Company (as Successor in Interest by way of Merger to Seaton Insurance Company, f/k/a Unigard Security Insurance, f/k/a Unigard Mutual Insurance Company); John C. Bonnie, of Weinberg Wheeler Hudgins Gunn & Dial, LLC, of Atlanta, GA, for Respondent Lexington Insurance Company; R. Michael Ethridge and Suzanne E. Chapman, of Ethridge Law Group, LLC, of Mt. Pleasant, and Wayne Karbal and Paul Parker, of Chicago, IL, for Respondent First State Insurance Company.

Matthew G. Gerrald, of Barnes Alford Stork & Johnson, LLP, of Columbia, and Laura A. Foggan, of Washington, D.C., for Amicus Curiae Complex Insurance Claims Litigation Association.

---

**JUSTICE JAMES:** In this opinion, we review the application of the "post-loss exception"—a common law rule providing that insurer consent is not required for an assignment of insurance benefits made after a "loss" has occurred. PCS Nitrogen seeks insurance coverage for liability arising from contamination of a fertilizer manufacturing site in Charleston, claiming its right to coverage stems from an assignment of insurance benefits executed by Columbia Nitrogen Corporation in 1986. Respondents—the insurance carriers who issued the policies in question—claim they owe no coverage because Columbia Nitrogen Corporation executed the assignment without their consent. The circuit court granted summary judgment to Respondents, and the court of appeals affirmed. *PCS Nitrogen, Inc. v. Continental Casualty Co.*, 429 S.C. 30, 837 S.E.2d 662 (Ct. App. 2019). We granted PCS's petition for a writ of certiorari. We reverse the court of appeals and remand for further proceedings.

# I. Background

## A. Corporate History and Insurance Coverage

In 1966, Columbia Nitrogen Corporation (Old CNC) began operating a fertilizer manufacturing site in Charleston (the Charleston Site). Respondents issued primary and excess liability insurance policies to Old CNC with policy periods ranging from 1966 to 1985. The policies provide, "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, caused by an occurrence . . . ." The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The policies contain two provisions pertinent to this appeal—a "consent-to-assignment" provision (sometimes referred to as an "anti-assignment" provision or a "no assignment" provision) and a "no action" provision. The consent-to-assignment provision states: "Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon." The no action provision states:

> No action shall lie against the company, unless, as condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Old CNC ceased all fertilizer production at the Charleston Site in 1972 and sold the Charleston Site to a third party in 1985. In 1986, Old CNC sold assets related to its fertilizer production business in Augusta, Georgia, to CNC Corp. (New CNC). In that transaction, New CNC assumed some of Old CNC's liabilities, including those related to Old CNC's fertilizer production business.

The 1986 transaction also included the assignment at the root of this appeal. In that assignment, Old CNC transferred to New CNC its rights under expired policies spanning from 1966 to 1985. Old CNC did not obtain Respondents' consent to the assignment.

Old CNC dissolved after closing the transaction with New CNC. In 1989, New CNC merged with Fertilizer Industries, Inc., which changed its name to Arcadian Corporation. In 1997, Arcadian Corporation merged with PCS Nitrogen.

## B. Federal Litigation

In 2005, Ashley II of Charleston, LLC, then-owner of the Charleston Site, filed a declaratory judgment action against PCS in federal court, alleging PCS was liable under CERCLA[1] for environmental remediation at the Charleston Site. Ashley II alleged Old CNC contaminated the Charleston Site and that PCS was liable for remediation because its predecessor, New CNC, acquired Old CNC's liabilities in the 1986 transaction. PCS argued it was not the corporate successor to Old CNC. PCS also filed a contribution counterclaim against Ashley II and third-party claims against several other entities with ties to the Charleston Site. Notably, PCS sought contribution from Old CNC's parent corporations, Koninklijke DSM N.V. and DSM Chemicals North America (collectively, the DSM Parties), arguing the DSM Parties were responsible for contamination caused by their "alter ego," Old CNC. PCS alleged Old CNC's "activities at the Charleston Site substantially contributed to the contamination of the Charleston Site property . . . ."

The district court found PCS liable under CERCLA and ruled there was no basis for imputing Old CNC's acts to the DSM Parties. *Ashley II of Charleston, LLC, v. PCS Nitrogen, Inc.*, 791 F. Supp. 2d 431, 440 (D.S.C. 2011). PCS appealed, and the Fourth Circuit affirmed. *PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161 (4th Cir. 2013).

## C. Current Litigation

Citing the assignment executed by Old CNC in 1986, PCS seeks a declaration that Respondents are obligated to provide coverage for its defense costs and environmental liabilities stemming from the CERCLA litigation. PCS contends Respondents' consent to the assignment was not required because the assignment took place after the loss occurred. PCS also argues it is the corporate successor to Old CNC via de facto merger and therefore acquired all the rights under Old CNC's policies. Respondents argue PCS is not entitled to benefits under either theory and also claim coverage is barred under the "pollution exclusion" in the policies.

---

[1] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

The circuit court granted summary judgment to Respondents, ruling the assignment is unenforceable as a matter of law because Old CNC did not secure Respondents' consent. The circuit court ruled the assignment is not a post-loss assignment because, at the time of the assignment, no judgment had been entered against Old CNC; the circuit court concluded "the loss in the third-party liability insurance context must be the event that fixes the insured contingency . . . a judgment against the insured." The circuit court also found Old CNC did not execute "an assignment of a chose in action for money payment, but an assignment of a contractual relationship—an attempt at a novation" that required insurer consent.

The circuit court also rejected PCS's argument that it is entitled to coverage as Old CNC's corporate successor under a de facto merger theory. Finally, the circuit court determined Respondents' motion for summary judgment with respect to the pollution exclusion was moot in light of its ruling that PCS is not entitled to coverage in the first instance. The court of appeals affirmed. *PCS Nitrogen, Inc. v. Continental Casualty Co.*, 429 S.C. 30, 837 S.E.2d 662 (Ct. App. 2019).

## II. Discussion

The question of whether the assignment is valid is a question of law. Accordingly, our standard of review on that issue is de novo. *See Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. Builders FirstSource-Southeast Grp.*, 413 S.C. 630, 634-35, 776 S.E.2d 434, 437 (Ct. App. 2015) ("When the circuit court grants summary judgment on a question of law, we review the ruling de novo.").

### A.

We must first address two arguments Respondents contend PCS makes, which, in fact, PCS does not make. First, Respondents contend PCS claims Old CNC assigned insurance policies to New CNC, not merely rights under expired insurance policies. This is a drumbeat sounded throughout Respondents' brief; however, PCS has never made the argument that Old CNC assigned the insurance policies. PCS correctly notes assignment of the policies would have been impossible because the policy periods had expired; the only remaining things to be assigned were policy rights or benefits with respect to occurrences that took place during the policy periods.

In a related argument, Respondents contend PCS did not appeal the circuit court's ruling that PCS was seeking—under a novation theory—to completely step into the shoes of Old CNC under the policies. Respondents claim PCS's failure to appeal that ruling makes it the law of the case and that, under the two-issue rule, we

must affirm the circuit court's decision. *Buckner v. Preferred Mut. Ins. Co.*, 255 S.C. 159, 160-61, 177 S.E.2d 544, 544 (1970) (holding an appellant's failure to challenge a second ground of the trial court's decision required affirmance). We disagree. A "novation" involves the substitution of parties to the policy, not merely the assignment of policy rights. PCS has repeatedly argued it does not seek to succeed to the policies, but rather to Old CNC's policy rights. The trial court's ruling on the novation issue is part and parcel of the issue PCS has advanced throughout the appellate process—whether Old CNC validly assigned its policy rights without insurer consent. We reject Respondents' preservation argument.

Second, Respondents claim that because Old CNC obtained insurer consent to assign a liability policy that was active at the time of the assignment, Old CNC knew it was also required to obtain Respondents' consent to assign the expired policies at issue in this case. Respondents then claim PCS "urges the Court to adopt a theory of assignment 'by operation of law,' which no state has ever adopted." Respondents represent in their brief that PCS cites *Northern Insurance Co. v. Allied Mutual Insurance Co.*, 955 F.2d 1353 (9th Cir. 1992)—right down to a pincite at page 1357 of the opinion—for this proposition. However, PCS does not ask this Court to adopt the theory of assignment by operation of law and does not refer to page 1357 of the *Northern Insurance* opinion at all. PCS cites *Northern Insurance* only for the general propositions that the purpose of a consent-to-assignment provision is to protect insurers against heightened risk and that the prospect of heightened risk vanishes after the loss takes place. Since PCS does not argue the policies were assigned by operation of law, we will not address the merits of Respondents' counterargument. We now address issues relevant to this appeal.

## B.

The consent-to-assignment provision of the policies issued by Respondents provides, "Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon." However, as we noted in dictum in *Narruhn v. Alea London Ltd.*, the majority rule is that such a provision does not bar an assignment made after a loss: "it is generally held that an assignment *after* a loss has already occurred does not require an insurer's consent." 404 S.C. 337, 344, 745 S.E.2d 90, 94 (2013).

Courts have recognized the post-loss exception because "[t]he purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity." *Id.* Additionally, the post-loss exception recognizes that a consent-to-assignment clause cannot bar an insured from

transferring the right to coverage that exists after a loss takes place. *See id.* at 344-45, 745 S.E.2d at 94 ("[A] clause restricting assignment [in an insurance policy] does not in any way limit the policyholder's power to make an assignment of the rights under the policy . . . ." (second alteration in original) (internal quotation marks omitted)).

Respondents cite decisions from Hawaii and Oregon holding that <u>no assignments</u>, even those made after a loss, are valid without insurer consent. *Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co.*, 183 P.3d 734, 747 (Haw. 2007); *Holloway v. Republic Indem. Co. of Am.*, 147 P.3d 329, 335 (Or. 2006). We decline to follow Hawaii and Oregon. We now adopt the post-loss exception and hold insurer consent is not required for an assignment of liability insurance coverage rights made after a loss.

## C.

### 1. The parties' arguments as to when the loss occurred

To answer the question of whether the 1986 assignment was executed pre-loss or post-loss, we must determine when the loss occurred. The policies do not define "loss." The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." PCS argues the terms "loss" and "occurrence" are synonymous. PCS therefore contends the assignment is a post-loss assignment because it was executed after the occurrence— discharge of contaminants with resulting property damage.

For reasons not pertinent to this appeal, Respondents do not concede the discharge of contaminants with resulting property damage was an "occurrence" as defined in the policies—that is an issue left for resolution on remand. Respondents argue that even if the discharge <u>was</u> an "occurrence," a "loss" would not occur until (1) an underlying suit results in a judgment against Old CNC for covered damages, or (2) a settlement is reached with the injured party with Respondents' consent. Specifically, Respondents contend "[t]he so-called 'post-loss' exception is really a 'chose in action' exception" and argue an assignment of insurance rights made without insurer consent is valid only when the insured possesses a "chose in action" under the policy. Respondents define "chose in action" as a "vested right to receive money" or a "debt" and contend their obligations under the policies would not mature into debts owing to the insured until judgment against Old CNC or settlement. Respondents claim the "no action" provision in the policies supports their position that Old CNC had no chose in action in 1986. The policies' no action

provision states, in relevant part, "No action shall lie against the [insurer] . . . until the amount of the insured's obligation to pay shall have been finally determined by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

Respondents claim our decision in *Howard v. Allen*, 254 S.C. 455, 176 S.E.2d 127 (1970), requires us to hold a loss does not take place until judgment or settlement because only then would the insurer's obligation to pay the insured become fixed. We flatly disagree, as the pertinent issues in *Howard* bear no resemblance to the issues now before us. Howard was injured in South Carolina by an airplane propeller and sought to sue the plane's owner, a resident of Ohio. Howard could not serve the defendant in South Carolina, so she sought to issue a summons, complaint, and warrant of attachment directing the Spartanburg County Sheriff to attach and seize the liability limits and duty to defend contained in a policy of liability insurance issued to the defendant by a carrier that did business in South Carolina. Howard claimed service of these documents upon the defendant's insurer gave South Carolina courts personal jurisdiction over the defendant because the insurer's duty to defend and the applicable liability limits were "debts" owed by the insurer to the defendant. The trial court quashed the warrant, and Howard presented the following question to this Court on appeal: "Does the duty to defend and the limit of liability contained in a policy of liability insurance constitute a 'debt' owed the policyholder which is subject to attachment, thereby conferring jurisdiction [over the defendant] upon the Courts of this State?" *Id.* at 458, 176 S.E.2d at 128.

We held in *Howard* that neither the duty to indemnify nor the duty to defend was a debt subject to attachment. We noted the defendant's insurance policy likely contained a no action clause stipulating that no action could be brought against the insurer until the liability of the insured was determined by final judgment or settlement. We explained that in light of the no action clause, "[i]t follows that insofar as the [duty to indemnify is] concerned, the insurer owes the insured nothing until the liability of the insured and the amount thereof has been determined." *Id.* at 460, 176 S.E.2d at 129. With respect to the insurer's duty to defend, we stated, "[t]here is no obligation to defend until an action is brought . . . ." *Id.* at 461, 176 S.E.2d at 129. We held that because the insurer had not failed to indemnify or defend the defendant at the time of the attachment, the insurer was not indebted to him: "At the time of the levy in the instant case the insurer had not failed to perform any obligation to the insured and was, therefore, we think, not indebted to him in any amount." *Id.* at 462, 176 S.E.2d at 130. Because the duties to indemnify and defend the defendant were not debts owed by the insurer, we held Howard could not attach them.

Respondents insist *Howard* requires us to hold that Old CNC did not have a chose in action under the policies in 1986. They claim *Howard* extends to the proposition that a loss occurs only when the insured possesses a debt or vested right to recover money. Therefore, according to Respondents, the assignment was a pre-loss assignment. We disagree. Our holding in *Howard* was much more straightforward than Respondents make it out to be. The narrow dynamic in *Howard* was an injured third party's effort to secure personal jurisdiction over a tortfeasor in South Carolina by attaching the insurer's contractual obligations to the tortfeasor. We simply held—in that setting—those obligations were not a debt subject to attachment by the injured third party. The term "chose in action" appears nowhere in *Howard*, and our holding in that case does not dictate the conclusion that an insured cannot assign policy rights to a corporate successor after a loss has occurred.

## 2. Loss takes place at occurrence

Though the insurer is not obligated to disburse proceeds until judgment or settlement, courts have long recognized that the insurer's coverage obligations and the insured's right to coverage arise well before that point. The Court of Appeals of Maryland explained this principle well over a century ago:

> It is not solely because the insured has actually paid damages that the liability of the insurer to him is fixed, but it is because an accident or casualty or occurrence has happened for which he is responsible, and against the loss arising from which he has been indemnified, that the obligation of the insurer to reimburse him arises, though the precise amount to be paid by the insurer may depend for its ascertainment upon events happening after the insolvency.

*Am. Cas. Ins. Co.'s Case*, 34 A. 778, 784 (Md. 1896). In 1939, the United States Court of Appeals for the Eighth Circuit held an assignment of insurance benefits made after the occurrence or underlying injury but before the insured's liability was fixed by judgment was enforceable as a post-loss assignment. *Ocean Accident & Guarantee Corp. v. Sw. Bell Tel. Co.*, 100 F.2d 441, 445-47 (8th Cir. 1939). The *Ocean Accident* court refused to equate loss with a judgment against the insured and held "under a liability policy such as the one under consideration, the liability, the loss and the cause of action arise simultaneously with the happening of the accidental injury . . . ." *Id.* at 446.

In the years since *Ocean Accident*, the overwhelming majority of jurisdictions have applied the post-loss exception to enforce assignments of insurance benefits made without insurer consent after an occurrence has taken place. *See Gopher Oil*

*Co. v. Am. Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 762-64 (Minn. Ct. App. 1999) (recognizing "when events giving rise to an insurer's liability have already occurred, the insurer's risk is not increased by a change in the insured's identity" and enforcing assignment of insurance interests made after environmental contamination took place); *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1226 (Pa. 2006) (enforcing assignment made after underlying occurrence because "[t]he event that occasioned the liability of [the insurer], was the 'Occurrence' to which the policy applied"); *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 126-29 (Ohio 2006) (rejecting an insurer's argument that a loss occurs upon a judgment against the insured because "the insurer's coverage obligation in an occurrence policy arises at the time of the occurrence" and "the lack of a specifically defined amount of recovery is not fatal to the determination that a chose exists"); *In re Ambassador Ins. Co., Inc.*, 965 A.2d 486, 490-92 (Vt. 2008) (holding consent-to-assignment clauses in insurance policies did not preclude enforcement of assignment and stating the "[insurer's] potential liability to insure [the insured] arose when parties were injured by [the insured's] products. Although the exact amount of [the insurer's] liability is not known because all of the suits against [the insured] have not been reduced to distinct monetary awards, [the insurer's] obligation to insure the risk has not been altered"); *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 103-07 (Del. Ch. 2009) (noting consent-to-assignment clauses in policies could not bar assignment made after loss, observing courts "have treated the 'loss' as occurring when liability arose[,]" and rejecting insurer's argument that claims were too speculative to be assigned); *Ill. Tool Works, Inc. v. Com. & Indus. Ins. Co.*, 962 N.E.2d 1042, 1049-50 (Ill. App. Ct. 2011) (rejecting an insurer's argument that the "loss" occurred upon judgment and stating "the loss was [the insured's] contamination of the [third party's] property, an occurrence for which [the insured] had bought defense and indemnification coverage").

The high courts of California and New Jersey recently applied the post-loss exception in factual scenarios similar to the one presented in this appeal. *Fluor Corp. v. Superior Ct.*, 354 P.3d 302 (Cal. 2015); *Givaudan Fragrances Corp. v. Aetna Cas. & Surety Co.*, 151 A.3d 576 (N.J. 2017). *Givaudan* is especially instructive. In both decisions, the courts examined the history of the post-loss exception and determined that under a third-party liability insurance policy, the loss arises at the time of the occurrence, not at the time judgment is entered against the insured. *Fluor Corp.*, 354 P.3d at 330 (holding that for purposes of the post-loss exception, loss "should be interpreted as referring to a loss sustained by a third party that is covered by the insured's policy, and for which the insured *may* be liable" (emphasis added)); *Givaudan*, 151 A.3d at 591 ("We begin by noting that the policies at issue are occurrence policies. They provide coverage based on liability

for an occurrence to which the policy applies. As such, the relevant event giving rise to coverage is the loss event, not the entry of a judgment fixing the amount of damage for that loss." (citation omitted)). The reasoning in these decisions is sound, and we agree that under a third-party liability insurance policy, the loss takes place at the time of occurrence.[2]

During oral argument, counsel for Respondents noted that in *Henkel Corp. v. Hartford Accident & Indemnity Co.*, 62 P.3d 69 (Cal. 2003), the Supreme Court of California held claims under an insurance policy were not assignable without insurer consent until the claims were reduced to a claim for a sum of money due or to become due under the policy. However, the court overruled *Henkel* twelve years later in *Fluor*.

Only one court has adopted the approach urged by Respondents in this case and held a loss under a third-party liability insurance policy does not necessarily take place at the time of the underlying occurrence. In *Travelers Casualty & Surety Co. v. U.S. Filter Corp.*, 895 N.E.2d 1172 (Ind. 2008), the Supreme Court of Indiana considered the claims of several companies that demanded liability coverage under policies issued to their predecessors by various insurers. The coverage dispute sprang from third-party bodily injury claims related to silica exposure from working near an industrial blast machine. The court noted other jurisdictions "widely recognize an exception to the enforcement of consent-to-assignment clauses for assignments made after a loss has occurred." *Id*. at 1178-79. However, the court distinguished "an instantly incurred loss, such as that resulting from windstorm or fire" from a loss that "occurred but went unreported, even unrealized, for years." *Id*. at 1179. The court decided that in order to qualify for assignment without insurer consent, "at a minimum . . . the loss must be identifiable with some precision" and "must be fixed, not speculative." *Id*. at 1180. The court concluded by holding that "[t]o the extent the . . . blast machine injuries had occurred but had not yet been reported at the time of the relevant transactions, they did not constitute an assignable chose in action." *Id*. at 1181.

---

[2] The *Fluor* decision centered upon the interpretation of a California statute tracing back to 1872 governing the assignment of claims "after a loss has happened." Cal. Ins. Code § 520 (West 2022). However, as the *Givaudan* court noted, "[w]hile the *Fluor* court necessarily applied the California statute in reaching its result, it also thoroughly reviewed the development of common law principles applicable to liability insurance and discussed the validity of anti-assignment clauses in light of those principles." 151 A.3d at 589.

We agree with the majority of jurisdictions and hold the "loss," in the context of the post-loss exception, is synonymous with the "occurrence." In this case, any loss occurred before Old CNC executed the assignment in 1986. We therefore reverse the court of appeals' holding that the loss does not take place until the insurer's obligation to pay is fixed by a judgment against the insured. *PCS Nitrogen, Inc.*, 429 S.C. at 42, 837 S.E.2d at 668. An insured's claim to coverage does not have to be reduced to a sum due or to become due under the policy for the claim to be assignable without insurer consent. After an occurrence, the insured possesses a contingent right to coverage, and it is a right that may be assigned without insurer consent.

**3. Was Respondents' risk increased by PCS's conduct during the CERCLA litigation?**

Respondents argue their risk was actually increased in this case because, during the CERCLA litigation (in which Ashley II, the current owner of the Charleston Site, sought environmental remediation costs from PCS), PCS sought to cast blame for the contamination upon Old CNC. Specifically, Respondents rely on a third-party complaint filed by PCS in the CERCLA litigation in which PCS alleged the DSM Parties, Old CNC's parent companies, should be held responsible for contamination caused by their "alter ego," Old CNC. In the third-party complaint, PCS alleged: "Discovery recently taken in this case has revealed that Old [CNC's] activities at the Charleston Site substantially contributed to the contamination of the Charleston Site property and thus rendered Old [CNC] a 'covered person' within the meaning of . . . CERCLA."

PCS's allegations against the DSM Parties and its attempt to obtain contribution from the DSM Parties did nothing to change Respondents' risk, which became fixed at the time of the loss and was solely related to Old CNC's activities at the Charleston Site. The circuit court granted summary judgment on the sole issue of whether the assignment was a valid post-loss assignment. The separate issue of whether PCS engaged in post-loss conduct that would serve to void coverage under the policies is not before us but may be considered on remand.[3]

**D.**

---

[3] Respondents also maintain the discharge of contaminants was not an "occurrence" under the policies and that coverage is voided by a pollution exclusion. There may be other coverage issues of which we are not aware. We express no opinion on issues that may arise on remand.

We are also persuaded by PCS's public policy argument that relieving Respondents of their contractual duty to provide coverage would give Respondents a windfall. As PCS argues, the risks at issue were factored into the original underwriting of the policies, and the premiums paid by Old CNC were in exchange for coverage against the same risks. Quoting *In re Viking Pump*, PCS contends it seeks to have Respondents "cover[] the risk [they] originally contracted to insure." 148 A.3d at 651-52. If the assignment is voided under these circumstances, Respondents would receive the windfall of never having to insure occurrences they received premiums for covering.

## III. Conclusion

We reverse the court of appeals and hold Old CNC executed a valid post-loss assignment of insurance rights in 1986. PCS cannot be denied coverage on the basis that Respondents did not consent to the assignment. In light of our holding on that point, we need not address PCS's argument concerning de facto merger. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive). We remand to the circuit court for further proceedings on PCS's claim for coverage.

**REVERSED AND REMANDED.**

**BEATTY, C.J., KITTREDGE and HEARN, JJ., concur. FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I concur in the majority opinion. I write only to express my dismay at Respondents' reliance on the meaningless phrase "chose in action" as a basis for its position. *See Arredondo v. SNH SE Ashley River Tenant, LLC*, 433 S.C. 69, 88, 856 S.E.2d 550, 560 (2021) (Few, J., concurring) ("If there was a time in our history when the phrase ['chose in action'] conveyed a precise meaning, the phrase has lost that meaning as the passage of time brought new usages. What is left of 'chose in action' is a descriptive phrase with no precise meaning, a phrase we should stop using because it is not only vague and meaningless but also obsolete. Today, if lawyers wish to write legal instruments . . . with precise meaning, they should use phrases that in current usage are defined precisely, and they should avoid phrases like 'chose in action' that mean nothing.").